UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| CITY OF FERNLEY,<br><br>              Plaintiff,<br>     v.<br>ERNEST A. CONANT, *et al.*,<br><br>              Defendants. | Case No. 3:21-cv-00119-MMD-CLB<br><br>ORDER |

**I.    SUMMARY**

Plaintiff the City of Fernley sued Defendants Ernest A. Conant, Regional Director of the U.S. Bureau of Reclamation and Commissioner United States Bureau of Reclamation over Defendants' approval of a plan to repair the Truckee Canal by partially lining it, which will effectively reduce groundwater available to Fernley and its residents because the canal will stop leaking[1] as much as it has since 1905 under the approved plan. (ECF No. 1.) The Court permitted landowners and water rights holders David F. Stix, Jr., and Deena E. Edmonston (collectively, "Intervenors") to intervene (ECF No. 15), and they filed a Complaint-in-intervention (ECF No. 9). The Court also permitted the Pyramid Lake Paiute Tribe ("Tribe") to intervene as a Defendant. (ECF No. 29.) Before the Court are Defendants' motions to dismiss both the Complaint (ECF No. 1) and Complaint-in-intervention (ECF No. 9). (ECF Nos. 19, 20.)[2] The Court held a hearing on

---

[1] The parties have different ways of describing this leakage. In this order, the Court uses the terms leak or leaking, canal seepage, recharge, and artificial recharge interchangeably. The point is that there is no dispute that some surface water running through the Truckee Canal mixes into the surrounding aquifers because the Truckee Canal is an "unlined, open earthen ditch." (ECF No. 1 at 3 (¶18).) All of these terms describe the water that leaks into the ground from the Truckee Canal.

[2] The Tribe joined one of the motions to dismiss (ECF No. 19). (ECF No. 31.) Fernley (ECF No. 33) and Intervenors (ECF No. 32) filed responses to the motions to dismiss. Defendants filed replies in support of their motions to dismiss. (ECF Nos. 41,

the motions to dismiss on December 8, 2021. (ECF No. 65 (the "Hearing").) Because Fernley and Intervenors lack prudential standing to bring their primary National Environmental Policy Act ("NEPA") claims as their interests are economic rather than environmental, Fernley fails to state a claim for nuisance under federal common law, the Court declines to exercise jurisdiction over Fernley and Intervenors' state-law declaratory judgment claims involving unsettled questions of state water rights, and as further explained below, the Court will grant both motions to dismiss.

## II. BACKGROUND

The following allegations are adapted from the Complaint and Complaint-in-intervention. Defendants issued a Record of Decision ("ROD") on the Truckee Canal Extraordinary Maintenance Plan on December 15, 2020, that Fernley—a town of around 20,000 residents that partially relies on canal seepage for its water needs—challenges as a 'final agency action' in this lawsuit.[3] (ECF No. 1 at 1-3, 12.) Fernley alleges that Defendants acted arbitrarily and capriciously in approving a "project to place a non-permeable liner within the Canal thereby cutting off the historical recharge that the canal has provided to the Fernley groundwater aquifer." (*Id.* at 2.) Fernley further alleges that Defendants violated NEPA by failing to consider alternatives that would either serve the project's purposes without cutting off the recharge, or mitigate those impacts, and did not fully consider the environmental impacts of reduced groundwater levels. (*Id.*)

As background, Fernley alleges that the Truckee Canal, completed around 1905, is an unlined earthen ditch that provides much of the groundwater used in the area because the canal leaks. (*Id.* at 3-5.) Indeed, the natural, annual recharge of the aquifer under Fernley has been estimated "at 600 acre-feet per year, but [the same estimate] noted that an additional 18,000 acre-feet per year of water seeps into the local aquifer

---

45.) The Tribe also joined the replies. (ECF Nos. 42, 49.) The Court accordingly refers to the pending motions to dismiss as Defendants' motions.

[3]Defendants noted that the pertinent documents, including the ROD, are accessible online. (ECF No. 19 at 14 n.3.) *See also* Bureau of Reclamation, *Record of Decision, Truckee Canal Extraordinary Maintenance* (December 2020); https://www.usbr.gov/mp/nepa/includes/documentShow.php?Doc_ID=47744.

from the unlined Truckee Canal." (*Id.* at 5.) In addition, apportionment of the water that flows through the Truckee Canal—that does not leak out—is governed by the *Orr Ditch* decree. (*Id.* at 4.) But enough water leaks out that the "Nevada State Engineer has issued more than 11,500 acre-feet per year of ground water permits in the Fernley basin including approximately 8,900 acre-feet per year of permits for municipal water." (*Id.*)

In 2008, "the north embankment of the Truckee Canal breached after a storm event causing flooding damage to approximately 590 homes located within Fernley." (*Id.*) To prevent a similar breach, the Truckee Canal has been operating under flow restrictions since then. (*Id.*) Meanwhile, Defendants have been studying how to repair the canal to prevent future breaches, and Fernley has been actively participating in these studies as a stakeholder. (*Id.*)

These studies led to the process that culminated in the challenged ROD. Well before Defendants issued the final EIS, the impact of the plan to fix the canal on area groundwater was included as an issue in initial scoping discussions about canal repair plans and surfaced in public comments. (*Id.* at 7-8.) Fernley urged Defendants to use a groundwater model developed by the Desert Research Institute, collect "social and economic data," and otherwise consider the impact of all plans being considered at the time on groundwater levels. (*Id.* at 9.) Defendants did not use Fernley's requested groundwater model, so Fernley commissioned its own expert to run simulations using the model showing that lining the Truckee Canal would significantly decrease groundwater levels in the Fernley area, causing 71% of existing domestic groundwater wells to fail over 40 years. (*Id.*)

In December 2018, Defendants shared an administrative draft EIS with Fernley that Fernley alleges only investigated alternatives involving at least some canal lining. (*Id.* at 9-10.) Fernley further alleges that this draft reflected inadequate study of the impact of the proposed plans on groundwater resources in the Fernley area. (*Id.* at 10.)

///

3

In March 2020, Defendants publicly released the draft EIS. (*Id.*) The draft EIS was similar to the administrative draft EIS except it included a preferred fifth alternative that still involved some canal lining. (*Id.*) Defendants only allowed for a 45-day public comment window even though the COVID-19 pandemic was happening, and Nevada's Governor issued a responsive stay-at-home order shortly after the comment period began. (*Id.* at 10-11.) Fernley submitted comments supported by its independent study results allegedly showing that the proposed plan would have a dramatic impact on Fernley's groundwater levels. (*Id.* at 11.)

In September 2020, Defendants issued the final EIS that Fernley similarly alleges failed to adequately account for the impact of the plan on groundwater levels. (*Id.*) Fernley attempted to confer with Defendants as to mitigation of groundwater impacts to Fernley before Defendants issued an ROD that would adopt the same proposed plan, but Defendants went ahead and issued an ROD in December 2020 adopting a plan that involved canal lining. (*Id.*)

Based on this planning process culminating in the ROD, Fernley alleges four claims: (1) violations of NEPA; (2) violations of the APA; (3) a claim seeking a declaratory judgment that "Fernley has a right to continued recharge from the Truckee Canal[;]" and (4) nuisance. (*Id.* at 12-17.) Fernley also seeks an order blocking Defendants from proceeding with the plan selected in the ROD, stating that the ROD violates NEPA, and rescinding the ROD. (*Id.* at 17.)

Intervenors allege the same first three claims as Fernley, but not a nuisance claim. (ECF No. 9 at 5-8.) Intervenors are property owners in the Fernley area who have wells that pump from the aquifer under Fernley. (*Id.* at 3.) Intervenor Stix also has a permitted groundwater right to support a commercial cattle operation. (*Id.*) Intervenors' allegations are essentially the same as Fernley's. (*Id.* at 3 (incorporating the Complaint by reference); *see also id.* at 3-5 (outlining a timeline of events substantially similar to the timeline described above).) But Intervenors also assert harms specific to them if Defendants are able to proceed with their plan that involves partially lining the Truckee Canal. (*Id.* at 5.)

4

1  Specifically, "the reduced inflow of water to the Fernley hydrographic area threatens" Intervenors' ability to draw and use water, which could cause their domestic wells to run dry and threaten the economic viability of Intervenor Stix's commercial cattle operation. (*Id.*)

### III.   DISCUSSION

The Court first explains why Fernley and Intervenors lack prudential standing to prosecute their NEPA claims, next explains its finding that Fernley fails to sate a nuisance claim, then explains why it will decline to exercise supplemental jurisdiction over Fernley and Intervenors' declaratory judgment claims, and then explains why it will not grant Fernley and Intervenors leave to amend.

### A.   Prudential Standing Under NEPA

NEPA is a procedural statute that requires federal agencies to "assess the environmental consequences of their actions before those actions are undertaken." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004). NEPA's express purpose is to protect the environment, *see, e.g.*, *Cantrell v. City of Long Beach*, 241 F.3d 674, 679 (9th Cir. 2001), and to ensure that federal agencies "carefully consider the impacts of and alternatives to major environmental decisions[]" before deciding to proceed. *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012).

As to standing, in addition to the Article III standing requirements, "a plaintiff bringing suit under the Administrative Procedure Act for a violation of NEPA must show that his alleged injury falls within the 'zone of interests' that NEPA was designed to protect." *Cantrell*, 241 F.3d at 679 (footnote omitted).[4] The Ninth Circuit Court of Appeals

---

[4] The omitted footnote in *Cantrell* explains that a plaintiff may only enforce NEPA through the APA because NEPA contains no private right of action. *See Cantrell*, 241 F.3d at 679 n.2. That footnote is pertinent to this case because both Fernley and Intervenors alleged their NEPA and APA claims as two separate claims tied together by short paragraphs incorporating all the preceding allegations in their complaints. (ECF Nos. 1 at 12-14, 9 at 5-7.) However, at the Hearing, Fernley's counsel conceded that Fernley has only one claim because he understands that NEPA must be enforced through the APA and does not contain a private right of action. This is also the case for

has long "described the zone of interests that NEPA protects as being environmental." *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 940 (9th Cir. 2005) (citation omitted). In contrast, "purely economic interests do not fall within NEPA's zone of interests." *Id.* And while the Ninth Circuit has held that a governmental entity in geographical proximity to the site of proposed action, and which must under NEPA be consulted in the EIS process, has standing to challenge an EIS, *Am. Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 965 (9th Cir. 1983), it may do so only if it demonstrates that the environmental health of its land interests is threatened by the agency's action. *See Churchill Cty. v. Babbitt*, 150 F.3d 1072, 1081 (9th Cir.), *opinion amended and superseded on denial of reh'g*, 158 F.3d 491 (9th Cir. 1998), *and abrogated on other grounds by Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011). In other words, "although NEPA states its goals in sweeping terms of human health and welfare, these goals are ends that Congress has chosen to pursue by *means* of protecting the physical environment." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 773 (1983) (footnote omitted, emphasis in original).[5]

///

---

Intervenors' separately alleged NEPA and APA claims both because Intervenors' counsel joined Fernley's counsel's arguments and it is the law. *See Cantrell*, 241 F.3d at 679 n.2. And as described herein, the Court agrees with Defendants that both Fernley and Intervenors lack prudential standing to proceed on their NEPA claims asserted through the APA. Thus, the Court does not separately address the APA claims in this order.

[5]The omitted footnote reads: "For example, § 2 of NEPA, 42 U.S.C. § 4321, provides:

'The purposes of this chapter are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.'

*People Against Nuclear Energy*, 460 U.S. at 773 n.6. Fernley relies on this very same paragraph, § 2 of NEPA, to argue that NEPA's zone of interests includes harm to the human environment. (ECF No. 33 at 11-12 & n.17.) However, Fernley's argument is unpersuasive because the *Metro. Edison Co.* Court expressly limited the zone of interests described in this § 2 of NEPA to harm to the physical environment. *See* 460 U.S. at 773.

Thus, the key question in this case is whether Fernley and Intervenors' interests are economic or environmental. And as further explained below, Fernley and Intervenors' interests are economic, not environmental—and they therefore fall outside the "zone of interests" NEPA was designed to protect. That means they lack prudential standing, and the Court lacks jurisdiction over their NEPA claim. *See Ashley Creek*, 420 F.3d at 939.

But the Court first dispenses with Intervenors' argument raised in their response brief that they can claim economic harm and that alone can give them prudential standing under NEPA.[6] (ECF No. 32 at 4-5.) Intervenors are incorrect. Intervenors' argument relies on *Bennett v. Spear*, 520 U.S. 154 (1997) and *Friends of Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115 (8th Cir. 1999). (ECF No. 32 at 4-5.) However, the Ninth Circuit explicitly considered these cases, distinguishing *Bennett* and rejecting the reasoning of *Friends of Boundary Waters*, in *Ashley Creek*, where it reiterated the "long-standing rule against purely economic interests falling within NEPA's zone of interests" and found that a mining company's mere interest in selling phosphate meant that company lacked prudential standing to assert a claim under NEPA. 420 F.3d at 940; *see also id.* at 939-945 (distinguishing *Bennett* because it was considering the zone of interests of a different statute, the Endangered Species Act, and rejecting the reasoning of *Friends of Boundary Waters* because the purpose of NEPA is environmental protection). Thus, a party asserting purely economic interests lacks prudential standing to sue under NEPA.[7]

---

[6]Intervenors also argue that Defendants' motion to dismiss their Complaint-in-intervention is procedurally improper, but the Court finds that argument unpersuasive. (ECF No. 32 at 2-3.) For the reasons Defendants offer in reply (ECF No. 41 at 5-6), Defendants' motion to dismiss the Complaint-in-intervention is timely. Moreover, as the determinative issue here is Intervenors' lack of prudential standing to assert their NEPA claim, which goes to the Court's jurisdiction, Defendants may raise their lack of prudential standing argument at any time. *See Ashley Creek*, 420 F.3d at 939 (specifying that putative NEPA plaintiffs must have prudential standing based on their environmental, and not purely economic, interests to have standing); *see also, e.g., Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 954 (9th Cir. 2011) (describing standing as an issue that goes to a court's subject matter jurisdiction and stating, "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action") (quoting Fed. R. Civ. P. 12(h)(3)).

[7]Unlike Intervenors, Fernley never took the position that economic interests alone would bring it within NEPA's zone of interests. (ECF No. 33 at 13-17.)

That brings the Court to the parties' arguments on prudential standing as they articulated them at the Hearing. After conceding that NEPA only covered harm to the physical environment, Fernley's counsel argued that the impact to the aquifer under Fernley if Defendants move forward with their plan and therefore cut off the current canal recharge—as specifically articulated in paragraph 90 of its Complaint—is harm to the physical environment sufficient to bring Fernley within NEPA's zone of interests. Paragraph 90 of Fernley's Complaint states:

> Like the draft EIS, the final EIS did not include any non-lining action alternatives, failed to fully analyze the impacts that the preferred alternative will have on ground water resources in Fernley, and failed to include any discussion or evaluation of mitigation measures that BOR could take to lessen or eliminate such impacts.

(ECF No. 1 at 11.) Intervenors' counsel joined Fernley's counsel's arguments and similarly argued that the depletion of water in the aquifer under Fernley is environmental harm sufficient to bring Intervenors within NEPA's zone of interests as well.

But Fernley and Intervenors' contention is ultimately unpersuasive because it overlooks who they are: groundwater users who, as evidenced by the allegations in their Complaint and Complaint-in-intervention, are concerned about having less groundwater available to use—for domestic and commercial purposes. Fernley describes itself as a "community of over 20,000 residents and various commercial and industrial businesses[.]" (ECF No. 1 at 3.) Intervenors describe themselves as property and groundwater permit holders who currently use water for domestic and commercial purposes. (ECF No. 9 at 3.) Intervenors describe the harm posed to them as a threat to their ability to draw and use groundwater for domestic and commercial purposes. (*Id.* at 5.) And indeed, Intervenors' Complaint-in-intervention does not describe any environmental harm. The closest thing it includes is a repeated allegation that Defendants failed to adequately consider the impact of their plan on the "groundwater aquifer[.]" (*Id.* at 4 (¶ 24), 5 (¶ 26), 6 (¶ 37).) However, Intervenors also state they are concerned about the impact on the groundwater aquifer because it threatens their property interests, their domestic wells,

and a commercial cattle operation. (*Id.* at 5 (¶¶ 28-29).) Intervenors describe an economic, not environmental, harm.

Fernley's Complaint contains more references to "environmental impacts" than Intervenors, but, like Intervenors, the gravamen of the harm alleged is economic. For example, Fernley describes the "environmental impacts" it is concerned about as "impacts to groundwater levels, the City of Fernley municipal water system, and domestic wells[.]" (ECF No. 1 at 2 (¶4).) In its response brief, Fernley argues that it alleges harm to the local groundwater aquifer itself in paragraphs 29-32 and 96 of its Complaint. (ECF No. 33 at 15 n.30.) But paragraphs 29-32 of the Complaint merely explain that several hundred domestic wells and the Fernley municipal water supply are utterly dependent on the recharge supplied by the canal seepage. (ECF No. 1 at 5 ¶¶29-32.) Coupled with the understanding from the rest of the Complaint that these wells and Fernley's municipal water supply will be negatively impacted if Defendants are allowed to proceed with their plan, this is an economic harm. Paragraph 96 states: "[a]s described above, the proposed lining of the Truckee Canal is a project which involves an unresolved conflict regarding alternative uses of available resources." This is not describing harm to the physical environment. And as to paragraph 90, that too refers to harm to "groundwater resources in Fernley," which, viewed in light of the whole Complaint, is describing an alleged harm to municipal water supplies—an economic interest. (*Id.* at 11 (¶90).) In sum, neither the Complaint nor the Complaint-in-intervention allege harm to the physical environment sufficient to bring Fernley or Intervenors within NEPA's zone of interests.

The allegations in the Complaint make this case distinguishable from the primary case upon which Fernley relies to make its prudential standing arguments: *Churchill Cty.*, 150 F.3d 1072. (ECF No. 33 at 14-15.) As Defendants point out in reply (ECF No. 45 at 7), in *Churchill Cty.*, Churchill County and the City of Fallon alleged—supported by affidavits from county and city officials—that the challenged plan involving reallocation of water would cause "environmental harm to County and City lands, including fire hazards, airborne particles, erosion, unknown changes to the underground water supply system,

1 and reduced quality of local drinking water." 150 F.3d at 1079.[8] Fernley's Complaint does not contain any similar allegations.

And while Fernley's response brief discusses how "declining water levels will, in turn, cause destructive land subsidence, [and] the elimination of phreatophyte plants and shrubs" (ECF No. 33 at 8), Fernley's counsel conceded at the hearing—as he must—that these allegations are not in the Complaint. The Court will further discuss these proto allegations again below when explaining why it will not grant Fernley leave to amend, but, for now, it suffices to say that these allegations are not in the Complaint.

Fernley and Intervenors also mentioned some federal regulations at the Hearing, particularly 40 C.F.R. § 1508.14, to support their argument that they have prudential standing because that regulation directs agencies to consider the impact of their proposed plan on the 'human environment.' (*See also* ECF No. 32 at 6 (relying in part on 40 C.F.R. 1508.14).) But in *Ashley Creek*, the Ninth Circuit rejected Fernley and Intervenor's approach taken at the Hearing of defining NEPA's zone of interests by looking to implementing regulations. *See* 420 F.3d at 943 n.4 ("courts should not use regulations to expand the zone of interests beyond what Congress intended"). And in any event, the *Ashley Creek* court specifically examined 40 C.F.R. § 1508.14 in the alternative and found it actually supported the Ninth Circuit's holding "that purely economic considerations are not within" NEPA's zone of interests. *See id.* at 943-45. Thus, Fernley and Intervenors' reliance on 40 C.F.R. § 1508.14 and other federal regulations, including regulations addressing environmental justice, does not convince the Court that they have prudential standing here.

///

---

[8]The presence of these sorts of allegations also means that another argument Fernley makes, that "alleged harm to a municipal water supply categorically falls within NEPA's stated purpose of preventing harm to the environment[,]" is unsupported by *Churchill Cnty.* (ECF No. 33 at 14.) The *Churchill Cnty.* court did not announce a categorical rule. *See Churchill Cnty.* 150 F.3d at 1079 ("Similarly, County and City have produced affidavits establishing that they possess and/or manage lands that would be adversely affected by the transfer of water rights under the Plan and under the fish recovery plan in § 207 of the Settlement Act.").

10

As to caselaw, all parties and the Court agree that no case is precisely on point here because neither the parties nor the Court have identified a reported Ninth Circuit or Supreme Court case addressing a situation where a federal agency is contemplating fixing its own project after more than 100 years, having the impact of at least partially cutting off canal seepage to the potential detriment of groundwater users. But the Court finds one case that Defendants and their counsel relied on at the Hearing analogous to this case. Specifically, Fernley and Intervenors are similarly situated to the ranchers in *Duval Ranching Co. v. Glickman*, 965 F. Supp. 1427, 1441 (D. Nev. 1997), who Judge Reed found lacked prudential standing to bring NEPA claims against federal agencies that allegedly interfered with their water rights to certain springs because they "may have an 'economic' interest in the springs at issue, but they cannot have an 'environmental' interest in them." *Id.* Like those ranchers, and as described above, Fernley and Intervenors have economic interests in their wells reliant on canal seepage, not environmental interests.

Fernley and Intervenors are also somewhat similarly situated to the trade association that the Ninth Circuit found lacked prudential standing in *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1103 (9th Cir. 2005), *as amended* (Aug. 17, 2005). There, the trade association only pointed to one paragraph to justify its standing under NEPA. *See id.* "Every allegation in this paragraph, however, concerns the economic interest of R–CALF [the trade association] members except the following: 'R–CALF USA members will also be adversely affected by the increased risk of disease they face when Canadian beef enters the U.S. meat supply.'" *Id.* Similarly, here, Fernley and Intervenors' allegations of environmental harm are few and far between in the Complaint and Complaint-in-intervention, and all describe harm in economic terms. Finally, Fernley and Intervenors are analogous to the ranchers' association the Ninth Circuit found lacked prudential standing to assert a NEPA claim in *Nevada Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993). Like Fernley and Intervenors here, particularly given the

11

arguments Fernley and Intervenors' counsel made at the Hearing, the plaintiff in that case tried to argue "that its members have an economic interest in maintaining the forest resources and therefore in protecting the environment." *Id.* But this was not enough to convey prudential standing. *See id.* Similarly, here, Fernley and Intervenors' argument that their action to protect their current water source may have knock-on environmental benefits is not enough to give them prudential standing under NEPA.[9]

In sum, NEPA protects environmental interests, not economic ones. *See, e.g.*, *Ashley Creek*, 420 F.3d at 939-45. Because Fernley and Intervenors have economic—but not environmental—interests in continuing to receive canal seepage through the pertinent groundwater aquifer, they lack prudential standing to prosecute their NEPA claims. Fernley and Intervenors' NEPA claims are therefore dismissed.

### B. Nuisance Claim

Fernley, but not Intervenors, asserts a nuisance claim. (ECF No. 1 at 16-17.) While not entirely clear from the Complaint, the parties agree that Fernley is asserting a federal common law nuisance claim.[10] (ECF Nos. 33 at 34, 45 at 17.) The parties also agree that

---

[9]*Nevada Land Action Ass'n* is analogous to this case in at least one other way as well. There, the Ninth Circuit noted that the plaintiff "does not allege that the increased grazing levels it seeks would benefit the natural environment, and there seems to be substantial evidence to the contrary." 8 F.3d at 716. And, the Ninth Circuit continued, the plaintiff "cannot invoke NEPA to prevent 'lifestyle loss' when the lifestyle in question is damaging to the environment." *Id.* Similarly, here, Defendants argued both in briefing and through its counsel at the Hearing that Defendants' decision to partially line the canal would not cause environmental harm because it would allow water to be delivered more efficiently to where it was needed, and both caselaw and good policy support the continuous development of more efficient methods of transporting and using water. Instead, Defendants argued, it is Fernley and Intervenor's conduct—pumping canal seepage out of the ground instead of investing in new, more water-use-efficient infrastructure—that harms the environment. The Court finds that argument persuasive. To phrase it as the *Nevada Land Action Ass'n* court did, Fernley and Intervenors are invoking NEPA here to prevent 'lifestyle loss'—a lifestyle predicated on the Truckee Canal leaking. But Fernley and Intervenors "cannot invoke NEPA to prevent 'lifestyle loss' when the lifestyle in question is damaging to the environment." *Id.*

[10]The Court will also assume as such for purposes of this order. If Fernley later argues it was attempting to assert a state law nuisance claim, the Court would decline to exercise supplemental jurisdiction over that claim because, as explained throughout this order, finding that Fernley can state a nuisance claim would require ruling on a novel issue of state law—namely, declaring that Fernley has a right to canal seepage—and the Court does not wish to do that because of the novelty of that right, the clear and consistent

a public nuisance as adjudicated under federal common law is "a substantial and unreasonable interference with a right common to the general public, usually affecting the public health, safety, peace, comfort, or convenience." (ECF No. 33 at 34 (citing ECF No. 19 at 25).[11]) Defendants argue the Court should dismiss Fernley's nuisance claim: (1) because it is barred under the doctrine of sovereign immunity; (2) it is barred by the applicable statute of limitations; (3) there is no federal common law governing intrastate, as opposed to interstate, water disputes like this one; (4) there appear to be no public nuisance cases regarding the absence of water, the discontinuance of artificial recharge, or the lowering of the groundwater table; and (5) assuming a public nuisance claim is available to Fernley, it fails because Fernley has alleged neither an unreasonable interference nor a public right. (ECF No. 19 at 34-38.)

Assuming without deciding that Fernley could overcome Defendants first three arguments enumerated above, the Court is persuaded by Defendants' fifth argument, which has two components—and the Court finds both of them persuasive. To start, the Court agrees with Defendants that its interference with Fernley's alleged water rights cannot be unreasonable because Defendants' challenged actions fall directly within the scope of authority given to them by Congress. Even setting aside the requirements that the *Orr Ditch* decree imposes on Defendants (*see* ECF No. 19 at 37), 43 U.S.C. § 510b(a) provides:

> The Secretary or the transferred works operating entity may carry out, in accordance with subsection (b) and consistent with existing transfer contracts, any extraordinary operation and maintenance work on a project facility that the Secretary determines to be reasonably required to preserve the structural safety of the project facility.

---

direction from caselaw that "the administration of water rights generally follows Nevada state law[,]" *United States v. Alpine Land & Reservoir Co.*, 341 F.3d 1172, 1180 (9th Cir. 2003), and the Court's general view that principles of federalism and comity both suggest the Court should allow the Nevada Supreme Court to define the contours of state water law. Thus, any later attempt by Fernley to argue it was attempting to allege a state law nuisance claim would not affect the Court's ultimate decision to dismiss the Complaint with prejudice.

[11] It appears Fernley intended to cite to ECF No. 19 at 37. Regardless, the Court agrees with the parties that, "[u]nder federal common law, a public nuisance is defined as an 'unreasonable interference with a right common to the general public.'" *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012).

13

*Id.* The purpose of the whole process culminating in the challenged ROD is to shore up the Truckee Canal to prevent future breaches like the breach that flooded Fernley in 2008. (ECF No. 1 at 5, 7.) And even Fernley's Complaint specifically alleges that the studies culminating in the ROD, "specifically identified improving canal safety and ensuring the reliability of deliveries as the two main purposes of any repair and maintenance project." (*Id.* at 5.) Thus, there appears to be no dispute that the Complaint even alleged that Defendants are operating outside the express authority that 43 U.S.C. § 510b(a).

And as Defendants argue, their plan to shore up the Truckee Canal and thereby protect public safety is *per se* reasonable because they are expressly authorized by statute to carry out their plan. (ECF No. 19 at 37 (citing Restatement (Second) of Torts § 821B cmt. f ("[C]onduct that is fully authorized by statute, ordinance or administrative regulation does not subject the actor to tort liability")).) *See also* 43 U.S.C. § 510b(a) (authorizing maintenance work reasonably required to preserve the structural safety of a project facility). And Fernley did not respond to this argument, which, even if not necessarily a concession, indicates there is some strength to it. In addition, Defendants' argument is logical: they cannot unreasonably interfere with another right by doing something authorized by statute that even Fernley alleges is both necessary and falls within Defendants' statutory authority. (ECF No. 1 at 5 (explaining that Defendants are attempting to improve canal safety and prevent incidents like the 2008 flood of Fernley from happening again).)

The Court also finds the second prong of Defendants' fifth argument persuasive: that Fernley has not—and cannot—allege an interference with a public right. As further explained below, Fernley's counsel conceded at oral argument that, if this Court somehow found a way to do so, it would be the first Court ever to recognize a Nevada state-law water right to canal seepage.[12] But that right would need to exist before Defendants could

---

[12] This renders Fernley's argument in its response brief that all water belongs to the public no longer pertinent. (ECF No. 33 at 36.) The Court accordingly does not further address it here.

1  interfere with it sufficient for Fernley to state a federal common law public nuisance claim.
2  In sum, Fernley fails to state a claim for federal common law public nuisance because it
3  can show neither unreasonable interference nor a public right. And the Court does not
4  see—nor has Fernley explained how—Fernley could amend its Complaint to plausibly
5  state such a claim.

6  Moreover, Fernley does not appear to dispute that this would be the first case ever
7  to recognize a public nuisance claim under federal common law against a federal agency
8  for taking an act expressly within its statutory authority that would have the effect of cutting
9  off canal seepage. (ECF No. 33 at 34-36.) Fernley instead generally argues that nuisance
10  has traditionally been understood to cover a wide range of subjects and could therefore
11  be expanded to cover the circumstances here. (*Id.*) The fact that Fernley's nuisance claim
12  appears unprecedented supports the Court's finding above that Fernley fails to state a
13  claim. Moreover, and as further explained below with respect to Fernley and Intervenors'
14  declaratory judgment claims, the fact that Fernley's nuisance claim depends on the Court
15  creating a new Nevada state-law right to canal seepage suggests that this is not the
16  proper court to assert such a novel claim in. Said otherwise, the Court also agrees with
17  what it enumerated as Defendants' fourth argument above. (ECF No. 19 at 37 (making
18  the argument).)

19  Fernley fails to state a claim for public nuisance under federal common law, and
20  amendment would be futile.

21  **C.    Supplemental Jurisdiction**

22  That leaves Fernley and Intervenors' claims for declaratory judgment that they
23  have a "right to continued recharge from the Truckee Canal[.]" (ECF No. 1 at 17; *see also*
24  ECF No. 9 at 9.) Defendants make several arguments as to why the Court should dismiss
25  these claims, but the simplest is the most persuasive. The Court declines to exercise
26  supplemental jurisdiction over these undisputedly[13] state-law claims.

---

[13]At one point during the Hearing, Fernley's counsel seemed to argue that the Court had independent, federal-question jurisdiction over Fernley's declaratory relief

Under 28 U.S.C. § 1367(c), the Court "may decline to exercise supplemental jurisdiction" over state law claims if:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

*Id.* And while the satisfaction of any one of these factors would be sufficient to support the Court's decision to decline to exercise jurisdiction over Fernley and Intervenors' state-law claims, *see id.*, at least the first three of the four factors are satisfied here.

Beginning with the third factor, the Court found above that Fernley and Intervenors lack prudential standing to assert their NEPA claims and therefore dismissed them. The Court also found Fernley failed to state a claim for public nuisance under federal common law, and that amendment would be futile. Thus, the Court has dismissed the only claims over which it might have had original jurisdiction, and the third § 1367(c) factor accordingly favors declining supplemental jurisdiction over Fernley and Intervenors' state law declaratory judgment claims. *See id.* at § 1367(c)(3).

As to the first factor, Fernley's counsel conceded at the Hearing that Fernley is asking this Court to recognize a novel Nevada water-law right—the right to continued canal seepage—which is a question of state law. Intervenors' counsel joined all of Fernley's arguments. And Defendants agree that the Court would be answering a novel question of state law if it granted Fernley and Intervenors' requested declaratory relief. (ECF No. 19 at 24.) There is accordingly no dispute that the first § 1367(c) factor also weighs against exercising supplemental jurisdiction over the parties' declaratory judgment claims.

///

---

claim, but he later clarified in response to questions from the Court that: (1) Fernley's declaratory relief claim is inextricably intertwined with its NEPA claim; and (2) Fernley was not arguing the Court would have original jurisdiction over its declaratory judgment claim if the Court dismissed its NEPA claim. Thus, Fernley's third claim for declaratory relief is a state law claim.

As to the second factor, Fernley affirmatively argues that its state-law declaratory judgment claim predominates over its federal-law NEPA claim. Fernley writes in its response brief, "this Court cannot properly rule on Fernley's APA and NEPA claims without first addressing whether Fernley does or does not have a right to the recharge under state law." (ECF No. 33 at 24.) Defendants' counsel pointed this out at the Hearing. To that end, the Hearing was useful in that it clarified for the Court that the real object of this lawsuit is to obtain a novel declaration of a state-law water right in canal seepage, where NEPA and the APA are merely the tools Fernley and Intervenors are using to try to get their declaratory relief claim before this Court. In any event, because of Fernley's affirmative argument quoted above, the second § 1367(c) factor also weighs in favor of declining supplemental jurisdiction over Fernley and Intervenors' declaratory judgment claims.

In sum, because at least three of the four § 1367(c) factors weigh in favor of declining supplemental jurisdiction over Fernley and Intervenors' declaratory judgment claims, the Court declines supplemental jurisdiction over those claims.

### D.    Leave to Amend

Fernley and Intervenors request leave to amend if the Court dismisses any of their claims. The Court has discretion to grant leave to amend and should freely do so "when justice so requires." Fed. R. Civ. P. 15(a); *see also Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990). Nonetheless, the Court may deny leave to amend if it will cause: (1) undue delay; (2) undue prejudice to the opposing party; (3) the request is made in bad faith; (4) the party has repeatedly failed to cure deficiencies; or (5) the amendment would be futile. *See Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008). Facts raised for the first time in a plaintiff's opposition papers should be considered by the Court in determining whether to grant leave to amend or to dismiss the complaint with or without prejudice. *See Orion Tire Corp. v. Goodyear Tire & Rubber Co.*, 268 F.3d 1133, 1137-38 (9th Cir. 2001).

///

The Court declines to grant Fernley and Intervenors leave to amend the Complaint and Complaint-in-intervention because amendment would be futile and justice does not otherwise require it. First, the Court already found above that it would be futile to allow Fernley to amend its public nuisance claim.

Second, Fernley and Intervenors would not fall within NEPA's zone of interests even if the Court granted them leave to add the additional allegations of environmental harm to their Complaint and Complaint-in-intervention because their interests are fundamentally economic, not environmental. This is evidenced by the way—as described above—both the Complaint and Complaint-in-intervention characterize the alleged harms to Fernley and Intervenors if Defendants proceed with their plan in economic and not environmental terms. And as also described above, Fernley and Intervenors are hard-pressed to identify allegations of harm to the physical environment in their Complaint and Complaint-in-intervention. The simplest explanation for that difficulty is that this case is not about harm to the physical environment.

There was some discussion at the Hearing about allegations regarding ground subsidence and harm to plants with long roots, which Fernley argued in its response brief were environmental harms that will befall the Fernley area if Defendants are able to proceed with their plan, but admittedly did not include in its Complaint. And of course, if there is less groundwater the ground could sink and some plants that depend on groundwater could die. However, the Court finds these potential harms are insufficiently connected to Fernley and Intervenors' stated interests to render granting leave to amend a productive exercise. As extensively described above, Fernley and Intervenors consistently characterize the harm they have allegedly suffered as harm to their continued right to pump groundwater, not harm to the environment. And those allegations of harm are consistent with who the parties are—entities that rely on pumping groundwater. Fernley and Intervenors do not, and could not plausibly allege, that they brought this case to remedy environmental degradation of the physical environment in the Fernley area.

///

18

Instead, Fernley and Intervenors' proposed allegations about subsidence and harm to plants with long roots strike the Court as analogous to the arguments the plaintiffs made in *Duval Ranching Co.*, 965 F. Supp. at 1441 and *Nevada Land Action Ass'n*, 8 F.3d at 716 that those courts found were insufficient to give those plaintiffs prudential standing in those cases. In general terms, the plaintiffs in those cases wanted a continued flow of a particular resource they had grown accustomed to for economic reasons—to preserve the viability of their ranching operations. Both sets of plaintiffs tried to argue that some negative environmental effects would occur if they were not permitted to continue using the applicable resource as they were used to, but both courts nonetheless found that those arguments did not give the plaintiffs prudential standing under NEPA because the plaintiffs' interests were economic, not environmental. The same goes for Fernley and Intervenors here. They have economic interests that they seek to protect. If they are unable to protect those interests, there may be some knock-on negative environmental impact.[14] But this case is not about those impacts, and Fernley and Intervenors are not the proper parties to assert those interests.

Or, as Defendants put it, nobody disputes "that NEPA is concerned with the quantity and quality of groundwater. But that is not this case." (ECF No. 45 at 6.) Fernley and Intervenors are not, for example, environmental groups whose mission is to protect the groundwater. And as explained throughout the Complaint, Complaint-in-intervention, and above, they seek to protect their right to groundwater currently available to them at less cost than they would be able to obtain water directly from the Newlands Project. While there is no question that it will be expensive and perhaps difficult for Fernley and Intervenors to procure alternate sources of water when Defendants proceed with their

---

[14]That said, as Defendants' counsel argued at the Hearing, and as previously noted, Fernley and Intervenors are arguably the ones causing the negative environmental impacts because they are currently pumping groundwater out of the aquifer, and really what they seek here is the continued right to keep pumping that water out of the ground instead of investing in more efficient infrastructure. Thus, like the ranchers in *Nevada Land Action Ass'n*, it is unclear that essentially allowing Fernley and Intervenors to maintain the status quo "would benefit the natural environment, and there seems to be substantial evidence to the contrary." *See* 8 F.3d at 716.

challenged plan, a NEPA claim is not the appropriate vehicle for them to block Defendants' plan. As the Ninth Circuit indicated in *Ashley Creek*, NEPA cannot be used by a party with a purely economic interest to block a plan it opposes for essentially economic reasons. *See* 420 F.3d at 939 ("The bottom line is that Ashley Creek's interest in the EIS analysis is purely financial. NEPA, on the other hand, is directed at environmental concerns, not at business interests."). In sum, the Court will not grant Fernley and Intervenors leave to amend to add allegations about the claimed harm to the environment offered in Fernley's response in an attempt to give them prudential standing under NEPA.

Third, Fernley's contention that "this Court cannot properly rule on Fernley's APA and NEPA claims without first addressing whether Fernley does or does not have a right to the recharge under state law[,]" (ECF No. 33 at 24), further supports the Court's finding that amendment is futile because, as described above, the Court finds that it would be improper to give Fernley what it apparently really wants from this case. The Nevada State Engineer, the Nevada Supreme Court, or even the *Orr Ditch* court would all be better courts to recognize Fernley and Intervenors' desired, novel, and apparently necessary, right to canal seepage.

In sum, the Court will dismiss both the Complaint and Complaint-in-intervention with prejudice.

## IV.   CONCLUSION

It is therefore ordered that Defendants' motions to dismiss (ECF Nos. 19, 20) are granted as to all claims with prejudice except for the declaratory judgment claims. The Court declines to exercise supplemental jurisdiction over the declaratory judgment claims.

The Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 13th Day of December 2021.

MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE