UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| CITY OF FERNLEY,<br><br>                        Plaintiff,<br>    v.<br><br>ERNEST A. CONANT, *et al.*,<br><br>                       Defendants. | Case No. 3:21-cv-00119-MMD-CLB<br><br>ORDER |

**I.     SUMMARY**

Plaintiff the City of Fernley sued Defendants Ernest A. Conant, Regional Director of the U.S. Bureau of Reclamation and Commissioner United States Bureau of Reclamation, over Defendants' approval of a plan to repair the Truckee Canal by partially lining it (the "Project"), which will effectively reduce groundwater available to Fernley and its residents because the canal will stop leaking[1] as much as it has since 1905. (ECF No. 1.) The Court permitted landowners and water rights holders David F. Stix, Jr., and Deena E. Edmonston (collectively, "Intervenors") to intervene (ECF No. 15), and they filed a complaint-in-intervention (ECF No. 9). The Court also permitted the Pyramid Lake Paiute Tribe ("Tribe") to intervene as a Defendant. (ECF No. 29.) Before the Court are the parties' cross-motions for summary judgment. (ECF Nos. 110, 111, 115.)[2] As further explained

---

[1]The parties have different ways of describing this leakage. In this order, the Court uses the terms leak or leaking, canal seepage, and artificial recharge interchangeably. The point is that there is no dispute that some surface water running through the Truckee Canal mixes into the surrounding aquifers because the Truckee Canal is an "unlined, open earthen ditch." (ECF No. 1 at 3 (¶18).) All these terms describe the water that leaks into the ground from the Truckee Canal.

[2]The Court also reviewed the corresponding responses and replies. (ECF Nos. 115, 117, 118, 121, 122, 123.) The Pyramid Lake Paiute Tribe joined Defendants' filings. (ECF Nos. 116, 124.)  The Court initially set a hearing but after more thoroughly reviewing the briefs in preparation for the hearing, the Court determined a hearing was unnecessary, and declined to continue the hearing to avoid further delay. (ECF No. 128.)

below, the Court will deny Plaintiffs' motions and grant Defendants' motion because—though it rejects Defendants' threshold challenges—it finds Defendants' Final Environmental Impact Statement ("FEIS") and Record of Decision ("ROD") both reasonable and adequate considering Plaintiffs' merits challenges.

## II. BACKGROUND

The Court begins by describing the undisputed facts most pertinent to the Court's resolution of the pending motions, and then describes the pertinent procedural history of this case.

### A. Factual Background

The Court begins by incorporating by reference the factual background provided in its prior order (since partially vacated to reflect that Plaintiffs were able to file amended complaints) because that factual background remains broadly accurate. (ECF No. 66 at 2-5.) Adding to that factual background, the Truckee Canal breached in 2008 and flooded homes in Fernley, Nevada. (AR 000056.)[3] This prompted Defendants to undertake numerous studies to find out what caused the breach and how to prevent future breaches. (AR 000163.) Defendants concluded from these studies that the breach likely resulted, "from internal erosion created by animal burrows in the Canal embankment, combined with a rapid increase in flow stage levels to capture storm floodwaters from the Truckee River." (*Id.*)

Defendants set out to repair the canal while reducing the risk of a similar breach caused by insufficiently strong embankments. (*Id.*; *see also* AR 000067.) In 2017, Defendants tested using sheet pile walls to line the canal, but the tests failed because it was too difficult to drive the sheet pile into the soil in the area. (AR 000083.) In 2019, Defendants released the Truckee Canal Engineering and Economic Feasibility Design Study for public review, concluding that an alternative substantially like the alternative they ultimately selected was the best approach. (AR 001467-68.)

---

[3]Citations in this style are to the continuously paginated Administrative Record ("AR") manually filed with the Court. (ECF No. 55 (noticing manual filing of the AR).)

In February 2020, Defendants released the draft EIS. (AR 001112.) In it, Defendants included discussion of various alternatives they had considered, but decided not to move forward with. (AR 001148-52.) Among other things, the draft EIS also stated that some prevention of the artificial recharge of groundwater would be an indirect adverse effect of all the alternatives Defendants were considering, including the preferred alternative and the no action alternative. (AR 001166.)

Defendants published the FEIS in September 2020. (AR000046-000575.) In December 2020, Defendants issued the ROD explaining why they chose Alternative 5, which involves lining some sections of the canal to reduce flood risk but leaving some unlined to allow for some artificial recharge. (AR 000006.) Plaintiff filed this case challenging the ROD in March 2021. (ECF No. 1.)

## B.  Procedural History

The Court dismissed the original versions of Plaintiffs'[4] complaints with prejudice in December 2021 (ECF No. 66) and then denied Fernley's motion to alter or amend that order to permit them to file an amended complaint (ECF No. 79). The United States Court of Appeals for the Ninth Circuit affirmed several of the Court's decisions but reversed the Court's decision not to grant Plaintiffs leave to amend and remanded for further proceedings. (ECF No. 87.) Plaintiffs subsequently filed amended complaints. (ECF Nos. 90, 91.) Both amended complaints allege a single claim for violation of the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* ("NEPA") via the Administrative Procedure Act, 5 U.S.C. § 500, *et seq.* ("APA"). Defendants did not move to dismiss these amended complaints. Instead, after settlement negotiations failed (ECF Nos. 94, 95, 96, 97, 98, 99, 100, 101, 103, 104, 105, 106, 107), the parties filed the pending cross-motions for summary judgment (ECF Nos. 110, 111, 115).

///

///

---

[4]When the Court uses the plural "Plaintiffs" in this order, it is referring collectively to Plaintiff and Intervenors.

3

## III. DISCUSSION

Defendants raise the threshold issues of Article III standing, prudential standing, mootness, and ripeness. (ECF No. 115 at 28-32.) The Court accordingly addresses these threshold issues before turning to the merits of Plaintiffs' NEPA arguments, beginning with Article III standing. *See Lance v. Coffman*, 549 U.S. 437, 439 (2007) ("Federal courts must determine that they have jurisdiction before proceeding to the merits.") (citation omitted).

### A. Article III Standing

A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears. *See Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978). Lack of Article III standing is a jurisdictional defect. *See* U.S. Const., Art. III, § 2 (limiting a federal court's power to "cases and controversies"); *Braunstein v. Ariz. Dep't of Transp.*, 683 F.3d 1177, 1184 (9th Cir. 2012) (emphasizing that an action brought without standing does not constitute a case or controversy). As with other jurisdictional requirements, "[t]he party invoking federal jurisdiction, [here Plaintiffs], bears the burden of establishing [the constitutional minimum of standing]." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Three elements must be met to establish standing—the plaintiffs must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan*, 504 U.S. at 560-61). These elements are an indispensable part of a plaintiff's case and therefore "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

Defendants argue Plaintiffs cannot satisfy the traceability and redressability elements of standing for the related reasons that groundwater pumping, not lining the canal, will cause a lower water table and its attendant adverse environmental consequences, and granting Plaintiffs their requested relief will not solve the problem of

decreasing groundwater levels—because pumping the groundwater out is what is causing it. (ECF No. 115 at 30.) Plaintiff does not directly respond to this argument and instead counters that it adequately alleged a procedural injury and geographic proximity. (ECF No. 117 at 7-8.) Intervenors counter that decreased canal leakage will cause the negative environmental consequences associated with decreasing groundwater levels because their and others' groundwater pumping is permitted based on the assumption that the aquifer will artificially recharge as it has been since 1905. (ECF No. 118 at 3-6.)

The Court is satisfied Plaintiffs have Article III standing to assert their NEPA claims against Defendants. Contrary to Defendants' arguments, to establish standing, Plaintiffs are not required to establish that their alleged environmental injuries are caused by Defendants' decision to line the canal, but instead must only show they have suffered an injury that "'is fairly traceable' to the federal action of the defendant and 'will be redressed by a favorable decision.'" *All. for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 600 (9th Cir. 2014) (citation omitted). And Defendants do not dispute that lining the canal will lead to less artificial recharge of the aquifer. (ECF No. 115 at 18.) In fact, in response to Fernley's comments during the draft EIS process, Defendants acknowledged, "reduced artificial groundwater recharge is an indirect adverse effect of the Proposed Action." (AR 000406.) Given the same amount of groundwater pumping that currently occurs, Defendants' decision to line the canal will lead to less water in the aquifer and the attendant environmental harms caused by less groundwater that Plaintiffs allege in their amended complaints. These harms are fairly traceable to Defendants' decision to line the canal. And while the Court discusses this further below when it addresses the parties' mootness and ripeness arguments, an injunction prohibiting Defendants from any further alteration of the canal that would reduce or eliminate recharge to the groundwater aquifer would similarly lessen the harms associated with less artificial recharge that Plaintiffs have sued over. (ECF No. 90 at 18 (seeking this relief); ECF No. 91 at 10 (seeking an order rescinding the ROD and FEIS).) *See All. for the Wild Rockies*, 772 F.3d at 600 (finding that alleged injury was fairly traceable to the challenged management plan).

Said otherwise, while it is true that groundwater pumping also causes the harms Plaintiffs complain about, that groundwater pumping reflects the status quo. Indeed, it appears undisputed that the State Engineer has handed out permits for much more groundwater pumping than natural recharge could support. Given both that status quo and the lack of dispute that lining the canal will also decrease artificial recharge, Plaintiffs' asserted injuries will not occur if the canal is not lined. Plaintiffs thus have standing to sue consistent with the allegations in their amended complaints. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1199 (9th Cir. 2004) ("because Sausalito's asserted injuries will not occur if the Plan is not implemented, Sausalito has alleged injury that can be redressed by a decision blocking implementation of the Plan."). After all, Plaintiffs' alleged "harm does not 'lie[ ] at the end of a 'highly attenuated chain of possibilities,'' but is rather a 'credible threat' that qualifies as an actual and imminent harm[.]" *San Luis Obispo Mothers for Peace v. United States Nuclear Regul. Comm'n*, 100 F.4th 1039, 1055 (9th Cir. 2024). Lower groundwater levels—whether they come from lining the canal or pumping more water out of the aquifer than is recharged—is likely to cause the harms that Plaintiffs have alleged.

### B. Prudential Standing

NEPA is a procedural statute that requires federal agencies to "assess the environmental consequences of their actions before those actions are undertaken." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004). NEPA's express purpose is to protect the environment, *see, e.g.*, *Cantrell v. City of Long Beach*, 241 F.3d 674, 679 (9th Cir. 2001), and to ensure that federal agencies "carefully consider the impacts of and alternatives to major environmental decisions[]" before deciding to proceed. *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012).

As to standing, in addition to the Article III standing requirements, "a plaintiff bringing suit under the APA for a violation of NEPA must show that his alleged injury falls within the 'zone of interests' that NEPA was designed to protect." *Cantrell*, 241 F.3d at

679 (footnote omitted). The Ninth Circuit Court of Appeals has long "described the zone of interests that NEPA protects as being environmental." *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 940 (9th Cir. 2005) (citation omitted). In contrast, "purely economic interests do not fall within NEPA's zone of interests." *Id.* That said, "[a] plaintiff may bring a NEPA claim 'even if his or her interest is primarily economic, as long as he or she also alleges an environmental interest or economic injuries that are 'causally related to an act within NEPA's embrace.'' (ECF No. 87 at 6 (citation omitted).)

Defendants reiterate the argument that they prevailed on previously in this case—Plaintiffs have merely an economic interest in pumping artificially-recharged groundwater thinly veiled with environmental concern that is insufficient to give them prudential standing. (ECF No. 115 at 28-29.) But since then, Plaintiffs have filed amended complaints that include allegations of environmental harm, specifically land subsidence, loss of phreatophyte vegetation, and diminished water quality caused by declining groundwater levels in the pertinent aquifer "without the recharge provided by the Canal[.]" (ECF No. 90 at 5; *see also* ECF No. 91 at 3, 7 (alleging similar harms).) And Plaintiffs argue these new allegations bring them within NEPA's zone of interests. (ECF Nos. 117 at 5-7, 118 at 3-5.) The Court agrees with Plaintiffs.

Indeed, in this very case, the Ninth Circuit found that the Court erred when it denied Plaintiffs leave to amend to add allegations of environmental harms that may fall within NEPA's zone of interests. (ECF No. 87 at 6.) The Ninth Circuit also found the Court applied an incorrect legal standard in reaching that decision, stating, "[t]he relevant question is not why a plaintiff chooses to sue, but whether the plaintiff alleges injury to an environmental interest." (*Id.*) Plaintiffs did that in their amended complaints. (ECF No. 90 at 5; *see also* ECF No. 91 at 3, 7 (alleging similar harms).) The Court accordingly finds that Plaintiffs have prudential standing to bring their NEPA claims.

**C.    Mootness and Ripeness**

Defendants next argue this case is simultaneously moot and not ripe because phase one of the Project, involving lining some three miles of the canal, has already been

7

completed, and phase two of the Project, which would involve lining more of the canal, is not currently—and may never be—funded. (ECF No. 115 at 30-32.) Plaintiff counters this case is neither moot nor unripe under *West v. Secretary of the DOT*, 206 F.3d 920, 925 (9th Cir. 2000) (ECF No. 117 at 9-10) and Intervenors similarly argue that this case remains ripe because further construction on the project could happen at any time if additional funding becomes available (ECF No. 118 at 6-8). The Court agrees with Plaintiffs.

*West* is analogous to the situation here. The *West* court rejected a mootness challenge even where stage 1 of a project was complete, and stage 2 had not yet begun. *See West*, 206 F.3d at 924-25. In rejecting that mootness challenge, the *West* court made the commonsense point that agencies could simply ignore the requirements of NEPA if they barreled ahead and completed projects while NEPA challenges were pending on the assumption that courts would find completion rendered challenges moot. *See id.* The same policy rationale applies here. Moreover, while the *West* court titled the pertinent section of its discussion 'Mootness,' it spoke in broader terms within that discussion of justiciability, which logically includes ripeness as well as mootness. *See id.*; *see also City & Cnty. of San Francisco v. Garland*, 42 F.4th 1078, 1084 (9th Cir. 2022) (describing both ripeness and mootness as questions of Article III justiciability). The *West* court further suggested that part of the reason that case remained ripe was that stage 2 of the project had not yet begun, so if the court found the defendants failed to comply with NEPA, it could remand for additional environmental review before stage 2 could proceed. *See West*, 206 F.3d at 924-25. Similarly, here, the Court could prohibit Defendants from proceeding with phase two until after they complete additional environmental review if it were to find Plaintiffs prevail on the merits of their claims. The Court accordingly finds this case ripe for decision—and not moot—and turns to the merits of Plaintiffs' NEPA claims.

**D.     NEPA Merits**

The parties raise overlapping arguments on the merits of Plaintiffs' NEPA claims (one each), so the Court addresses their arguments together—and structures its NEPA

8

discussion accordingly. But the Court begins its analysis with one argument only Fernley raises after first describing the applicable legal framework.

The Court reviews Defendants' decision to issue the ROD based entirely on the contents of the AR under the APA. "The APA does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010). But "[u]nder the [APA], a reviewing court shall 'hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law....'" *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (quoting 5 U.S.C. § 706(2)(A)). An agency's decision may be reversed as arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "To make this finding, the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).

But in reviewing an agency's decision under this standard, "the reviewing court may not substitute its judgment for that of the agency." *Envtl. Def. Ctr., Inc. v. U.S. Envtl. Prot. Agency*, 344 F.3d 832, 858 n.36 (9th Cir. 2003). Although this review is narrow, "a reviewing court must conduct a searching and careful inquiry into the facts." *Nw. Motorcycle Ass'n*, 18 F.3d at 1471. "A satisfactory explanation of agency action is essential for adequate judicial review, because the focus of judicial review is not on the wisdom of the agency's decision, but on whether the process employed by the agency to reach its decision took into consideration all the relevant factors." *Asarco, Inc. v. U.S. Envtl. Prot. Agency*, 616 F.2d 1153, 1159 (1980).

The Court reviews for substantial evidence the agency's factual conclusions based on the administrative record. *See Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1068 (9th Cir. 2018). "Where 'evidence is susceptible of more than one rational interpretation,' [the Court upholds] the agency's finding if a 'reasonable mind might accept [it] as adequate to support a conclusion.'" *Id.* (citation omitted).

### 1. Defendants' Decision Not to Use the DRI Groundwater Model

Plaintiff argues that Defendants violated NEPA by failing to use the 'best available science' because they declined Plaintiff's request to run further groundwater modelling using Plaintiff's proffered 'DRI model.'[5] (ECF No. 111 at 22.) Defendants counter that further groundwater modelling lost its usefulness after the meeting Plaintiff refers to in making this argument because they decided for various reasons to only consider alternatives that involved at least some canal lining, and already understood that lining the canal would cause decreased artificial recharge. (ECF No. 115 at 46-48.) Defendants further argue they explained these same reasons to Plaintiffs in written comment responses regarding the draft EIS, so Plaintiff's suggestion that Defendants ignored its request is inaccurate. (*Id.*; *see also* ECF No. 111 at 22 ("ignored").) The Court agrees with Defendants.

"[I]nherent in NEPA and its implementing regulations is a 'rule of reason,' which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004). Extending from this principle, "[t]he Court applies a 'rule of reason' standard when reviewing the adequacy of an agency's EIS." *Sierra Club v. U.S. Dep't of Transp.*, 310 F. Supp. 2d 1168, 1186 (D. Nev. 2004) (citation omitted). "Review under the rule of reason and for abuse of discretion 'are essentially the same.'" *Id.* (citation omitted).

Under this standard, Defendants' decision not to use the DRI model for additional or more granular model runs of the Project's impact on groundwater was reasonable. And

---

[5]DRI is short for the Desert Research Institute. (ECF No. 111 at 22.)

it is not as if Defendants ignored Plaintiff's request to use it because Defendants responded to Plaintiff's comments on the draft EIS and offered similar reasons to those they offer now as to why Defendants chose not to. (ECF No. 115 at 46-48 (making this argument).) Indeed, the AR indicates that Plaintiff asked Defendants whether they had used the DRI model in the analysis they had conducted at an in-person meeting on June 7, 2018, and Defendants' answer was "no, because there would be impacts on shallow groundwater if any of the action alternatives were used." (AR 002539.) Later, Defendants responded to Plaintiff's similar comment on the draft EIS by stating that further use of the groundwater modelling, "would not provide new information that would alter the analysis of the Proposed Action and alternatives." (AR 000406.) Defendants went on to state, "reduced artificial groundwater recharge is an indirect adverse effect of the Proposed Action." (*Id.*) Moreover, in response to another, similar comment by Intervenors on the draft EIS, Defendants similarly noted that reduced artificial groundwater recharge was an indirect effect of the proposed action and asserted that further analysis using the DRI groundwater model would not provide new information that would alter the analysis Defendants had already completed. (AR 000405.) In sum, Defendants did not ignore Plaintiff's request to run the DRI groundwater model more; they rejected it and told Plaintiff why.

And the Court cannot say Defendants erred in rejecting Plaintiff's request for more modelling of the adverse consequences on groundwater from lining the canal using the DRI model because Defendants also acknowledged at the time that their proposed alternatives, which involved lining the canal, would all have the indirect adverse effect of reduced artificial groundwater recharge. (AR 000405-06.) Said otherwise, Defendants were aware of the precise consequence that Plaintiff argues Defendants would have become aware of if they had conducted more runs of the DRI groundwater model. They already knew lining the canal would reduce artificial groundwater recharge. They were not required to run another model more times to reach the same conclusion under the rule of reason. *See Pub. Citizen*, 541 U.S. at 767 (permitting agencies to determine the

usefulness of any additional information to their pertinent analysis). And the fact that Defendants specifically responded to comments asking them to run the DRI model more and offered the same reasons they offer in their briefing for why they did not think that would be useful further suggests Defendants took the requisite hard look at the issue. *See Save the Peaks Coal. v. U.S. Forest Serv.*, 669 F.3d 1025, 1037 (9th Cir. 2012) ("courts may consider responses to comments for confirmation that an agency has taken a 'hard look' at an issue under NEPA.").

The Court accordingly rejects Plaintiff's argument that it should set aside the FEIS or ROD because Defendants declined to run the DRI groundwater model additional times.

### 2. Defendants' Right to Determine Plaintiff's Right to Groundwater

Plaintiff also reiterates its argument from earlier in this case that Defendants lacked authority to determine Plaintiff had no right to seepage water (ECF No. 111 at 25-26), and Intervenors echo that argument as part of their argument that Defendants failed to include sufficient mitigation measures in the EIS for fixing the canal without reducing seepage (ECF No. 110 at 15-17). However, the Ninth Circuit squarely addressed and rejected this argument on appeal. (ECF No. 87 at 7-8.) Indeed, the Ninth Circuit disagreed with the premise Plaintiffs again try to advance—that Defendants themselves determined the City of Fernley had no legal entitlement to seepage water—finding the pertinent statement in the EIS "merely descriptive" and going on to clarify that same statement had "no legal effect on Plaintiffs' ability to pursue their water rights claims through the mechanisms provided by Nevada law." (*Id.* at 7.) Moreover, the Ninth Circuit affirmed the Court's decision declining to exercise jurisdiction over Plaintiffs' declaratory judgment claim seeking recognition of an artificial recharge right under Nevada state law. (*Id.* at 8.) While it appears Plaintiffs are now attempting to repackage that claim as part of their NEPA claims, the Ninth Circuit rejected precisely the argument they present again in this briefing. *See supra*. The Ninth Circuit accordingly left no room for the Court to set aside the EIS or ROD on these grounds.

///

### 3. Alleged Insufficient Analysis of the Effect on Groundwater Levels

Plaintiffs further argue that Defendants failed to sufficiently analyze the impacts of their preferred alternative on the groundwater aquifer in the Fernley area, including impacts on land subsidence, plants, and decreased water quality. (ECF Nos. 110 at 12-14, 111 at 15-21.) Defendants counter in pertinent part that they sufficiently considered these impacts. (ECF No. 115 at 48-50.) The Court agrees with Defendants.

The Court serially addresses Plaintiffs' pertinent arguments. Plaintiffs first argue Defendants insufficiently considered the significance of the decreases in groundwater levels the Project will indirectly cause. (ECF Nos. 110 at 13-14, 111 at 15-18.) But Defendants stated in the EIS that the Project will have indirect consequences in terms of decreased artificial recharge whether Defendants pursued the no action alternative or any of the alternatives. (AR 000099 ("Canal seepage decreases with decreased flow in the Canal."), *id.* (examining studies attempting to quantify pertinent artificial recharge and reporting that 698 groundwater wells will likely be affected by the preferred alternative), AR 000103 (noting that the prevention of artificial recharge due to canal lining would be an indirect adverse effect on Plaintiffs and stating that "wells fed by seeps in the lined sections will go dry."), AR 000105 (noting that, under the no action alternative, "[a]s the Canal continues to deteriorate, more restrictive long-term flow/stage-level restrictions may be implemented, potentially reducing seepage through the Canal. Shallow groundwater users who rely on the artificial groundwater recharge would eventually be affected by the reduced seepage.").) An EIS is only required to contain a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." *State of Cal. v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (citation omitted). Defendants satisfied that standard in considering the adverse, indirect consequences to artificial recharge from lining the canal in the EIS—as indicated by the citations included immediately above. Defendants were not required to, as Plaintiffs seem to suggest, explain exactly how bad it will be for every person who relies on a groundwater well when

13

that well runs dry; it suffices to say that the well will run dry. And Defendants said as much in the EIS.

Plaintiff further argues that the EIS was deficient because it failed to contain any discussion of subsidence that could occur because of decreased groundwater levels. (ECF No. 111 at 18.) However, Plaintiff concedes that Defendants included their opinion based on their expertise that subsidence was unlikely to occur in an appendix to the EIS but argues Defendants should have included it in the main body of the EIS because a decisionmaker is more likely to read that part. (*Id.* at 19.) Plaintiff does not proffer any legal authority suggesting that including an explanation for why subsidence is unlikely to occur in an appendix instead of the body of the EIS warrants setting the EIS aside. (*Id.*) And the Court finds Defendants' explanation that they did not consider subsidence a significant risk—delivered in response to a comment from Plaintiff—reasonable. (AR 000354-55 (explaining that Defendants conducted studies on soil from 2009-12, concluded that the soil around and under the canal was over-consolidated, and inferring from that data that "the lowering of the groundwater table would not increase the effective stress to a magnitude greater than the sediments have experienced in the past or that is necessary to further consolidate the sediments. This suggests that widespread subsidence from lining portions of the Truckee Canal and continued domestic well operation by the City of Fernley is not likely.").) Thus, and contrary to Plaintiff's argument, Defendants addressed their subsidence concern and concluded it was insubstantial based on their technical expertise. And the Court, "generally must be 'at its most deferential' when reviewing scientific judgments and technical analyses within the agency's expertise." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011) (citation omitted). The Court accordingly must defer to Defendants' scientific judgment based on their prior technical analysis that the risk of widespread subsidence caused by lining the canal was not significant.

Plaintiff also argues that the EIS was insufficient because it failed to consider impacts to phreatophyte vegetation, or plants with long roots that depend on groundwater

14

for their survival, outside the immediate Project area. (ECF No. 111 at 20.) But as Defendants counter, the EIS addressed impacts on vegetation, just not phreatophyte vegetation specifically. (ECF No. 115 at 48-49.) And contrary to Plaintiff's argument that Defendants did not consider any impacts on vegetation outside the Project area, Defendants considered impacts on vegetation outside the Project area in the draft EIS. (AR 001187 ("The amount of potential riparian vegetation loss resulting from Canal lining would be minor; this is relative to the amount of similar vegetation directly outside the Project Area and in the region that would not be affected under the alternatives.").) And Defendants more generally considered impacts on vegetation in the final EIS, including outside the Project area. (AR 000117-000129.) Plaintiffs do not proffer any legal authority supporting the very specific point that Defendants were required to consider Project impacts on phreatophyte vegetation. (ECF No. 111 at 20.) And like subsidence impacts, the sorts of vegetation that will be impacted by a project are technical judgments Defendants had discretion to make.

To the extent Plaintiff is highlighting the difference between the riparian vegetation Defendants primarily considered in the EIS and the fact that phreatophyte vegetation depends on groundwater, the Court finds it notable that, as described above, Defendants extensively otherwise considered the impact on artificial recharge that any of the proposed alternatives—including even the 'no action' alternative—would have. Defendants indicate a clear awareness in the final EIS and predecessor documents that the Project will decrease artificial recharge, which necessarily would have an indirect adverse impact on plants that depend on that artificial recharge. Considering this extensive discussion together with the discussion of potential impacts on other types of vegetation described immediately above, Defendants took a sufficiently hard look at the vegetation impacts of the Project. Moreover, Defendants' analysis of groundwater and vegetation impacts have something in common: Defendants acknowledge some indirect adverse consequences. But neither NEPA nor cases interpreting it requires an agency to only pursue projects with no adverse consequences. Defendants appear to have

15

reasonably decided they could tolerate some of the adverse indirect consequences they described in the EIS to accomplish their goal of shoring up the canal and decreasing the flood risk to Fernley that prompted this process in the first place.

Plaintiff further argues that the EIS is insufficient because Defendants failed to consider how decreased groundwater levels will lead to increased concentrations of arsenic and other minerals in the groundwater that remains. (ECF No. 111 at 21.) Defendants counter that they sufficiently addressed groundwater quality in the EIS. (ECF No. 115 at 49-50.) The Court again agrees with Defendants.

Defendants discussed groundwater quality in the EIS. (AR 000101-02.) Defendants discussed the surface water quality impacts of each of the considered alternatives including the no action alternative. (AR 000096-000107.) Defendants specifically discussed the groundwater quality impacts of the no action alternative. (AR 000105.) And as noted above, Defendants also discussed how the Project will have the indirect adverse effect of reducing artificial recharge. (AR 000103.) Taken together, this constitutes a reasonable discussion of the groundwater and water quality impacts of the considered alternatives.

In sum, the Court declines to set aside the EIS or ROD because Defendants insufficiently considered the impacts of the Project on groundwater.

### 4. Alleged Failure to Consider a Reasonable Range of Alternatives

Plaintiffs also argue that Defendants failed to adequately consider a reasonable range of alternatives to the preferred alternative, specifically more options that did not involve lining the canal. (ECF Nos. 110 at 14-15, 111 at 10-15.) Defendants counter that they considered non-lining alternatives as part of the alternatives-development process, but ultimately excluded them from consideration by the time they prepared the EIS because they had determined non-lining alternatives would not serve the Project's goals. (ECF No. 115 at 32-39.) And Defendants further argue they gave a reasoned explanation for excluding the non-lining alternatives from the EIS, which is all they were required to do. (*Id.* at 34-35.) Defendants also note they considered Plaintiff's preferred alternative of

16

1  sheet pile walls but found they could not drive them into the soil during a field test—and
2  thus determined that approach was infeasible. (*Id.* at 35-39.) The Court agrees with
3  Defendants.

4      "NEPA also requires an EIS to discuss, among other things, alternatives to the
5  proposed action." *HonoluluTraffic.com v. Fed. Transit Admin.*, 742 F.3d 1222, 1231 (9th
6  Cir. 2014) (citation omitted). But the Court reviews Defendants' selection of alternatives
7  under the rule of reason, understanding that the reasonable range of alternatives is
8  dictated by the nature and scope of the proposed action. *See id.* An agency is not required
9  to "explicitly consider every possible alternative to a proposed action[,]" but must "explain
10 its reasoning for eliminating an alternative[.]" *N. Alaska Env't Ctr. v. Kempthorne*, 457
11 F.3d 969, 978 (9th Cir. 2006).

12     Defendants explained their reasoning for eliminating non-lining alternatives from
13 consideration before reaching the EIS phase of the Project in the EIS—including the
14 specific approaches Plaintiffs raise in their motions—and thus satisfied their burden under
15 NEPA. Defendants decided not to dig the canal deeper because it could still degrade over
16 time and there would be significant canal downtime during construction, and because that
17 approach would not "alleviate risks from hydrologic inflows." (AR 000084.) Defendants
18 reasonably rejected attempting to reduce demand for surface water that runs through the
19 canal without repairing it because that would not serve the Project's safety goals, it
20 ignores that minimum water flows remain necessary to deliver water through the canal,
21 demand reduction efforts were separately and already in effect, and because there would
22 be less artificial recharge if less water was moving through the canal. (AR 000085-86;
23 *see also* AR 000098-99.) Reconstructing the canal embankment was rejected "because
24 the reconstruction would use earthen materials only, [and] there would be the potential
25 for rodents, tree roots, and seepage to weaken the embankment over time." (AR 000083.)
26 "Soil or cement-bentonite slurry walls were not evaluated in the EES (Reclamation 2019)
27 or EIS because they would not effectively address the embankment risk associated with
28 burrowing animals and/or tree roots." (*Id.*) And sheet pile walls were eliminated from

consideration, "because the field trial in September 2017 showed that the vinyl sheet piles could not be driven through the geologic strata at two of the three test locations (Reclamation 2018c)." (*Id.*) Finally, Defendants determined lining only the sides of the canal "would not address the hydrologic risk or reduce the potential failure mode to tolerable long-term risk levels. (AR 000085.)

"The record [thus] shows that the EIS team considered and directly responded to suggestions that" Defendants consider more non-lining alternatives including those addressed above and urged by Plaintiffs in their pending briefing. *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 870 (9th Cir. 2004). (*See also* AR 003035 (explaining why Defendants chose not to reconstruct the earthen banks of the canal), AR 000383-85 (responding to a comment with an explanation why Defendants chose not to line only the sides of the canal or use a mesh lining, "because it would not address tree roots or small rodents."), AR 000421 ("Other alternatives that did not involve lining the Canal, such as soil and cement-bentonite slurry walls and sheet pile walls, were previously analyzed and found to be ineffective at resolving the problem.").) Defendants were only required to explain their "reasoning for eliminating an alternative[,]" and they did that here. *Kempthorne*, 457 F.3d at 978.

The Court accordingly declines to set aside the EIS or ROD because of the range of alternatives Defendants considered.

### 5. Alleged Inadequate Mitigation Measures

Plaintiffs finally argue the EIS is fatally flawed because it did not discuss or evaluate means to mitigate the probable environmental impact of less groundwater in the aquifer under Fernley. (ECF Nos. 110 at 15-17, 111 at 23-24.) Defendants counter that they both considered mitigation of the indirect adverse effect of reduced seepage and chose the preferred alternative in part because it mitigated some of that impact. (ECF No. 115 at 50-53.) The Court again agrees with Defendants.

While NEPA does not require the mitigation of environmental harms, "it does require that an EIS discuss mitigation measures, with 'sufficient detail to ensure that

environmental consequences have been fairly evaluated.'" *S. Fork Band Council Of W. Shoshone Of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009) (citation omitted). "Such discussion necessarily includes 'an assessment of whether the proposed mitigation measures can be effective.'" *Pac. Coast Fed'n of Fishermen's Associations v. Blank*, 693 F.3d 1084, 1103 (9th Cir. 2012) (citing *W. Shoshone*, 588 F.3d at 727). "Mitigation includes: (a) [a]voiding the impact altogether by not taking a certain action or parts of an action[;] (b) [m]inimizing impacts by limiting the degree or magnitude of the action and its implementation[;] (c) [r]ectifying the impact by repairing, rehabilitating, or restoring the affected environment[;] (d) [r]educing or eliminating the impact over time by preservation and maintenance operations during the life of the action[; or] (e) [c]ompensating for the impact by replacing or providing substitute resources or environments." *Japanese Vill., LLC v. Fed. Transit Admin.*, 843 F.3d 445, 457 (9th Cir. 2016) (quoting 40 C.F.R. § 1508.20).

As Defendants note, Plaintiffs do not challenge the environmental protection measures discussed in the ROD to mitigate construction-related impacts of the Project. (ECF No. 115 at 50 (citing AR 000010-13).) Plaintiffs instead focus their mitigation challenge on decreased artificial recharge. (ECF Nos. 110 at 15-17, 111 at 23-24.) But in the ROD, Defendants wrote that they chose, "an alternative that minimizes the impacts [to artificial groundwater recharge] by not including full concrete lining of the Fernley reach." (AR 000018.) "In addition, [under the Alternative 5 they selected] a stretch along the Fernley Reach would not be lined, thus allowing for some continued artificial groundwater recharge in that area." (AR 000007.) Defendants accordingly implemented mitigation sanctioned by 40 C.F.R. § 1508.20(b) by leaving some sections of the canal unlined and thus allowing some artificial recharge to continue occurring. To elaborate, Defendants concluded that Alternative 1-3 would eliminate artificial recharge, and the no action alternative would also reduce it, but preferred Alternative 5 would permit 3,924 acre feet per year of seepage to continue. (AR 000104.) This also constitutes a discussion of whether this mitigation measure of leaving some of the canal unlined would be effective

because it quantifies the seepage that will continue to occur. (*Id.*) Defendants' preferred alternative does not entirely mitigate the indirect, adverse impact of reduced artificial recharge, but it sufficiently discusses and mitigates it.

The Court declines to set aside the EIS or ROD because of the mitigation measures discussed therein.

## IV. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motions before the Court.

It is therefore ordered that Intervenors' motion for summary judgment (ECF No. 110) is denied.

It is further ordered that Fernley's motion for summary judgment (ECF No. 111) is denied.

It is further ordered that Defendants' motion for summary judgment (ECF No. 115) is granted.

The Clerk of Court is directed to enter judgment accordingly—in Defendants' favor—and close this case.

DATED THIS 22nd Day of January 2025.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE